# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SYCAMORE PARTNERS MANAGEMENT, L.P. (F/K/A SYCAMORE PARTNERS MANAGEMENT, L.L.C.), SYCAMORE PARTNERS, L.P., and SYCAMORE PARTNERS A, L.P., | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. N18C-09-211 AML CCLD |
| ENDURANCE AMERICAN INSURANCE COMPANY, CONTINETAL CASUALTY COMPANY, ZURICH AMERICAN INSURANCE COMPANY, XL SPECIALITY INSURANCE COMPANY, STARR INDEMNITY & LIABILITY COMPANY, MARKEL AMERICAN INSURANCE COMPANY, ARGONAUT INSURANCE COMPANY, GREAT AMERICAN COMPANY, IRONSHORE INDEMNITY, INC., and EVEREST NATIONAL INSURANCE COMPANY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**Submitted: July 6, 2021**
**Decided: September 10, 2021**

# MEMORANDUM OPINION

**Upon Plaintiffs' Motion for Partial Summary Judgment:
GRANTED**

**Upon Defendants' Motions for Summary Judgment:
DENIED**

David J. Baldwin, Esquire, Peter C. McGivney, Esquire, of BERGER HARRIS LLP, Wilmington, Delaware, John E. Failla, Esquire, Nathan R. Lander, Esquire, Elise A. Yablonski, Esquire, Tiffany M. Woo, Esquire, of PROSKAUER ROSE LLP, New York, New York, *Attorneys for Plaintiffs Sycamore Partners Management, L.P., Sycamore Partners, L.P., and Sycamore Partners A, L.P.*

Elena C. Norman, Esquire, Michael A. Laukaitis, II, Esquire, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware, Michael F. Perlis, Esquire, Richard R. Johnson, Esquire, of KAUFMAN BORGEEST & RYAN LLP, Woodland Hills, California, Sebastian Quitmeyer, Esquire, of KAUFMAN BORGEEST & RYAN LLP, New York, New York, *Attorneys for Defendant Markel American Insurance Company.*

Carmella P. Keener, Esquire, of COOCH AND TAYLOR, P.A., Wilmington, Delaware, Ronald P. Schiller, Esquire, Daniel J. Layden, Esquire, Isabel C. Naviera López, Esquire, of HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER, P.C., Philadelphia, Pennsylvania, *Attorneys for Defendant Ironshore Indemnity, Inc.*

**LEGROW, J.**

The plaintiff investment funds acquired in a leveraged buyout a holding company that owned lucrative assets the plaintiffs intended to resell. Before the merger closed, classes of the company's stockholders brought derivative actions against the company's board of directors alleging the directors, aided and abetted by the funds, breached their fiduciary duties in failing to secure better merger terms and in conducting an incomplete voting process. Although the stockholders referenced the funds' plan to extract the company's high-performing assets, they did not claim the funds' intent to do so was wrongful. Instead, the stockholders claimed the board would have obtained a better merger price had it pursued, among other investments, the funds' strategy on the company's behalf. The board settled the stockholders' claims without contribution from the investment funds, and the merger closed.

Having acquired the company, the funds executed a series of restructuring transactions that allowed the funds and their affiliates to divest, liquidate, and resell the company's high-performing assets. After those transactions closed, the company received letters from counsel representing an unidentified group of the company's bondholders. Through the letters, counsel requested from the company information and documents that counsel believed relevant to determining whether the company's merger and subsequent restructuring violated an indenture between the company and the bondholders. Counsel did not demand money or any other legal or equitable

relief from the company. After the company refused counsel's information requests, the company heard nothing further from the bondholders or their counsel.

Having assumed debt from the merger that it could not service without the equity in the assets it sold to the funds, the company filed for Chapter 11 protection. During the company's bankruptcy proceedings, the company's creditors investigated potential claims against third parties that could generate capital for the company's reorganization. During that investigation, the creditors concluded the funds' restructuring transactions were executed when the company was insolvent. The company's estate accordingly sued the funds alleging fraudulent transfers, self-dealing, and related contractual breaches and business torts arising from the restructuring transactions.

To obtain dismissal of the estate's claims, the funds entered into a $120 million settlement with the company's estate. That settlement was confirmed in the company's Chapter 11 plan. Before paying the settlement, the funds sought insurance coverage from the defendant insurers pursuant to "pay on behalf of" management liability insurance policies that insure settlement costs. The insurers, however, refused coverage. Having been denied insurance coverage, the funds paid the settlement using their own cash, cash from their affiliates, and debt from third-party lenders.

2

The funds then brought this breach of contract and declaratory action against their insurers, contending the insurers wrongfully denied them coverage. In response, the insurers have raised several defenses based on terms in the funds' insurance policies. At the pleadings stage, the funds obtained dismissal of one of those defenses. The parties now have moved for summary judgment as to several of the insurers' remaining defenses.

The parties' independent and cross motions present four principal questions that are governed by unambiguous terms in the funds' insurance policies. *First*, did the estate's bankruptcy litigation, which alleged the funds' restructuring transactions involved fraudulent transfers and self-dealing, "arise out of" or "result from" the stockholders' derivative lawsuits, which challenged the merger's price and voting process and alleged the acquired company's board failed to secure better terms? *Second*, do the letters from the bondholders' counsel, which were addressed to the company and requested documents and information related to a contract to which the funds were not parties, constitute a "demand for . . . non-monetary relief" from the funds? *Third*, may an insurer of a "pay on behalf of" policy who denies coverage for a loss, thereby prompting the insured to seek third-party funding for that loss, then avoid its coverage obligations on the theory that the insured was "absolved from" the loss because it did not pay all the costs from its personal coffers? *Fourth*, may an insurer avoid coverage on the theory that the insured misrepresented prior

knowledge of "any" claim-producing wrongdoing when the insured represented only that it did not have prior knowledge of wrongdoing that could be "reasonably expected" to produce a claim?

The Court answers all these questions in the negative, resulting in a finding that three of the insurers' defenses fail as a matter of law. As to the insurers remaining two defenses, the Court finds both rest on an unreasonable interpretation of the policies and one, additionally, rests on disputed facts. Accordingly, and for the reasons discussed below, the funds' motion for partial summary judgment is **GRANTED**, and the insurers' motions for summary judgment are **DENIED**.

## BACKGROUND[1]

Sycamore[2] contends Markel American Insurance Company ("Markel") and Ironshore Indemnity, Inc. ("Ironshore" and together with Markel, the "Insurers"[3]) breached the Policies by refusing to provide Sycamore excess insurance coverage for Loss it incurred in the Nine West Settlement. In response, the Insurers have raised several affirmative defenses. In a previous ruling, the Court held one of those

---

[1] The Court has drawn its factual recitations from the record submitted with the parties' motions and the reasonable inferences permitted by that record. Where appropriate, the Court cites to the record directly. The Court otherwise assumes the parties' familiarity with the case's background, including the background outlined in its February 26, 2021, memorandum opinion, which the Court incorporates by reference. *See generally Sycamore Partners Mgmt., L.P. v. Endurance Am. Ins. Co.*, 2021 WL 761639, at *1–3 (Del. Super. Ct. Feb. 26, 2021) ("*Sycamore I*").

[2] Capitalized terms have the meaning ascribed them in *Sycamore I* unless otherwise noted.

[3] The term "Insurers" originally captured Markel, Ironshore, and three of their codefendants. *See generally id.* at *2. Those three codefendants since have settled and were dismissed as parties with prejudice. D.I. 277, 283, 291.

4

defenses invalid as a matter of law. The parties now move for summary judgment on certain of the Insurers' remaining defenses that are based on specific provisions and exclusions in the Policies and representations made in a related agreement.

## A. The Policies

The Policies insure "Claims" made from December 31, 2016, through June 30, 2018, that produce up to $100 million in "Loss." Relevant to this decision are the definitions, coverage provisions, exclusions, and conditions that are integral to the Insurers' defenses.

### 1. Claims; Insureds; Loss

The Policies define a Claim as "any written demand for monetary or non-monetary relief (including, but not limited to, injunctive relief) commenced by the receipt of such demand."[4] To be insurable, the Claim must be made "against" an "Insured" or "Insured Entity" and be based on a "Wrongful Act."[5] An Insured or Insured Entity is defined as Sycamore.[6] Wrongful Act means, in relevant part, an "act, error, omission, . . . or breach of fiduciary duty or other duty."[7]

---

[4] D.I. 236, Ex. 16 at General Terms and Conditions § I.(D)(1) (hereinafter "Policies"). Because the Policies follow form to a primary coverage agreement, the Court generally cites the primary agreement when referencing the Policies. Where more clarity is necessary, the Court cites a specific excess policy.
[5] *Id.* at Coverage Part § I.(A).
[6] *Id.* at General Terms and Conditions § 1.(J)(7); *id.* at Endorsement #1 (Schedule of Funds).
[7] Policies at Coverage Part § III.(H). Where applicable, the parties do not dispute that Sycamore's alleged wrongdoing meets the Wrongful Act definition.

5

To receive coverage, Sycamore must incur Loss. Under the Policies, Loss includes "settlements" and "judgments."[8] Loss does not, however, include "any amount for which the Insureds are absolved from payment."[9] Loss is incurred as soon as Sycamore becomes "legally obligated to pay"[10] for it. When Sycamore incurs such an obligation, the Insurers agreed to "pay [the Loss] on behalf of" Sycamore.[11] The Policies also allow an Insured or "any other source," including "parties on behalf of the Insured," to pay for Loss.[12] The Policies do not contain a term excluding coverage if Sycamore pays for the Loss before receiving coverage.

**2. Coverage Provisions; Exclusions**

The Policies contain several terms that bar or exclude coverage.

**a. The Interrelated Claims Provision**

The Policies bar coverage for Claims made during the Policies' period that are "deemed" "[i]nterrelated" with Claims made outside the Policies' period (the "Interrelated Claims Provision").[13] Under the Interrelated Claims Provision,

> [a]ll Claims arising from Interrelated Wrongful Acts shall be deemed to constitute a single Claim and shall be deemed to have been made and noticed at the earliest time at which the earliest such Claim is made or deemed to have been made. . . .[14]

---

[8] *Id.* at General Terms and Conditions § I.(O).
[9] *Id.* at General Terms and Conditions § I.(O)(3).
[10] *Id.* at General Terms and Conditions § I.(O).
[11] *Id.* at Coverage Part § I.
[12] *Id.* at General Terms and Conditions § I.(O); D.I. 236, Ex. 18 at SYC0150251 (hereinafter "Markel Policy"); D.I. 236, Ex. 21 at Endorsement #2 (hereinafter "Ironshore Policy").
[13] *Id.* at General Terms and Conditions § II.(D).
[14] *Id.*

6

The Policies, in turn, define "Interrelated Wrongful Acts" as

> Wrongful Acts which are based on, arise out of, directly or indirectly result from, are in consequence of or in any way involve any of the same or related or series of related facts, circumstances, situations, transactions or events.[15]

### b. The Prior Notice Exclusion

The Policies also exclude coverage for Claims that, before the Policies' period began, were "the subject of any notice under any other policy of insurance" (the "Prior Notice Exclusion").[16]  Specifically, under the Prior Notice Exclusion,

> the Insurer[s] shall not be liable to make payment for Loss in connection with any Claim made against an Insured based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event, Investigation or Wrongful Act which, before [the Policies' period], was the subject of any notice other policy of insurance. . . .[17]

The Prior Notice Exclusion only applies, however, if the former policy "affords coverage . . . for such Loss in whole or in part, as a result of such notice." [18]

### c. The PPL Exclusions

The Policies contain an exclusion that concerns "pending and prior litigation" (the "PPL Exclusion").  Each Insurer's policy contains a separate PPL Exclusion, but each Exclusion mirrors the other's language.

---

[15] *Id.* at General Terms and Conditions § I.(L).
[16] *Id.* § IV.(B)(1).
[17] *Id.*
[18] *Id.*

7

[Ironshore:] [T]he Limits of Liability shall not apply to [C]laims made against the Insured based upon, arising from, or in consequence of any demand, suit, or other proceeding pending, or order, decree or judgment entered against any Insured prior to December 31, 2016, or the same or substantially the same fact, circumstance or situation underlying or alleged therein.[19]

[Markel:] The Limits [o]f Liability shall not apply to Claims made against the Insured based upon, arising from, or in consequence of any demand, suit, or other proceeding pending, or order, decree or judgment entered against any Insured prior to [December 31, 2016], or the same or substantially the same fact, circumstance or situation underlying or alleged therein."[20]

### 3. The Warranty Letter

As a condition to issuing the Policies, the Insurers required Sycamore to execute a letter agreement through which Sycamore represented it lacked knowledge of conduct that could produce a Claim (the "Warranty Letter").[21] The Warranty Letter contains four paragraphs. In the first paragraph, Sycamore represented:

[N]o person for whom this insurance is intended has any actual knowledge or information of any act, error, [or] omission that is reasonabl[y] expected to give rise to a claim within the scope of the [Policies].[22]

In the second paragraph, the parties imposed a penalty for misrepresentations.

It is agreed that any claim based upon, arising from, or to any act, error, [or] omission of which any such person has any actual knowledge or information will be excluded from the [Policies].[23]

---

[19] Ironshore Policy at Endorsement #3.
[20] Markel Policy at SYC0150254.
[21] D.I. 229, Ex. B (hereinafter "Warranty Letter").
[22] *Id.* ¶ 1.
[23] *Id.* ¶ 2.

In the third paragraph, the Insurers affirmed their reliance on "the above representation."

> It is also agreed that such carriers noted above are relying upon the above representation. . . .[24]

In the fourth paragraph, the parties agreed knowledge of such wrongdoing possessed by one Insured would not be imputed to another.

> It is agreed that with respect to the foregoing, no knowledge or information possessed by an Inured [*sic*] will be imputed to another Insured for purposes of determining the availability of coverage under the Proposed Insurance.[25]

## B. The Merger and the Carve-Out Transactions

In 2013, Sycamore targeted The Jones Group, Inc. ("Jones" or the "Company"), a publicly traded retail fashion holding company, for acquisition and resale. Later that year, Sycamore executed a purchase agreement through which Sycamore would take the Company private as the surviving entity of a cash-for-stock reverse triangular merger with a Sycamore-controlled acquisition vehicle (the "Merger"). To accomplish the Merger, Sycamore paid $15 per share to the Company's stockholders using leveraged funding. After the Merger closed, Jones was renamed Nine West.

Through the Merger, Sycamore sought to extract and resell Nine West's highest-performing assets. To achieve that goal, Sycamore directed, post-Merger, a

---

[24] *Id.* ¶ 3.
[25] *Id.* ¶ 4.

series of inter-affiliate restructuring sales and divestitures out of which those assets emerged as independent portfolio companies (the "Carve-Out Transactions"). The Carve-Out Transactions were discussed in the Merger's plan and related documents.[26] Ultimately, Sycamore liquidated most of these assets and resold what remained on the secondary market.

## C. The Jones Shareholder Suits

In January 2014, before the Merger closed, a class of Jones stockholders brought derivative lawsuits against the Company's directors (the "Board"), Sycamore, and Sycamore affiliates (the "Jones Shareholder Suits"). Those suits sought to enjoin the Merger or to rescind it upon closing.[27] Relying on the Company's proxy statements and public filings, the class alleged the Board proposed the Merger using "an unfair process" and submitted an "unfair price" for stockholder approval.[28] Expanding those themes, the class accused the Board of breaching its fiduciary duties by accepting Sycamore's "inadequate [per-share] consideration" and by agreeing to restrictive Merger terms that prevented the Board during the Merger's go-shop phase from optioning or consummating a profit-maximized deal for the stockholders, rather than for management personally.[29] The class also

---

[26] D.I. 236, Ex. 1 § 6.17 (Plan of Merger).
[27] D.I. 236, Ex. 5.
[28] *Id.* ¶ 1.
[29] *Id.* ¶¶ 13–15.

charged Sycamore's managers and affiliates with aiding and abetting the Board's alleged fiduciary violations.[30]

As support for its theory that the Merger approval process was flawed, the class cited as one example the disclosures about the planned Carve-Out Transactions.[31] Rather than contending the proposed Carve-Out Transactions were wrongful, would render Jones insolvent, or otherwise would damage the Company's brands, the class argued the Merger's proxy forms contained "financial analyses [that] significantly omit[ted] . . . valuation" of the assets' "division."[32] The class further alleged this information was "material . . . to cast[ing] a fully informed vote on" the Merger.[33] Moreover, the class claimed the misstated disclosures adversely affected the Merger's price. According to the class, had the Board considered "strategic alternatives," like the Carve-Out Transactions, the value of the Company's equity could have increased.[34] Instead, the class maintained, the Carve-Out Transactions would benefit Sycamore alone.[35]

At the time of the Jones Shareholder Suits, Sycamore had a different insurance policy (the "2014 Policy"). Invoking the 2014 Policy, Sycamore provided notice of

---

[30] *Id.* ¶¶ 35–37, 182–201.
[31] *Id.* ¶ 92 ("The Board also considered the Carve-Out Transactions as part of the [Merger].").
[32] *Id.* ¶ 12.
[33] *Id.*
[34] *Id.* ¶ 151.
[35] *Id.*

11

the Jones Shareholder Suits to its insurer.[36]  Shortly thereafter, however, the Board

settled the class's claims.  Sycamore was not liable for, and so did not contribute to,

the settlement.[37]  Accordingly, Sycamore retracted its coverage claim.[38]

## D. The Bierman Letters

As previously noted, Sycamore accomplished the Merger through a leveraged

buyout.  By consequence, the Company assumed considerable transaction-based

debt, and Nine West, as the successor entity, became responsible for servicing that

debt.  Nine West also became responsible for servicing pre-existing Jones debt,

including corporate notes Jones had issued to investors years before the Merger.

As to the pre-existing debt, the Merger's potential implications for the

Company's maturing bond obligations prompted written outreach, on two occasions,

from Steven Bierman, an attorney purporting to represent a group of unidentified

Nine West noteholders (the "Bierman Letters").[39]

Bierman addressed his first Letter to Nine West and its general counsel.[40]  In

his first Letter, Bierman opined the Merger and subsequent Carve-Out Transactions

"appear[ed]" to "transfer[]" to "Sycamore-related entities substantially all" the

---

[36] D.I. 236, Ex. 6.
[37] *Id.* Ex. 7.
[38] *Id.* Ex. 8.
[39] D.I. 236, Ex. 9, 11 (hereinafter "First Bierman Letter" and "Second Bierman Letter" respectively).
[40] First Bierman Letter at 1–2.

Company's assets.[41] According to Bierman, that change in control may have "violated" a provision in an indenture agreement that allegedly prohibited such a sale.[42] To verify or dispel that theory, Bierman, "on behalf of" his putative clients, "request[ed] that [Nine West] provide . . . documents sufficient to establish the timing and order of the Merger [and the Carve-Out Transactions] . . . as well as documents sufficient to set forth what assets were conveyed from what entities as part of the [Carve-Out Transactions]."[43] Failure to provide such information, Bierman cautioned, could lead his clients to conclude "the transactions in question violated" the indenture agreement.[44] In that case, Bierman continued, the noteholders would "undertake appropriate actions or remedies against [Nine West] and Sycamore, including" declaring a default and accelerating the instruments.[45] At the conclusion of his first Letter, Bierman advised Nine West, "as well as Sycamore," "to preserve documents regarding [the Merger and Carve-Out Transactions]."[46]

About a week later, Nine West, through its outside counsel, rejected Bierman's information requests.[47] As support for that position, Nine West claimed

---

[41] *Id.* at 2.

[42] *Id.* at 2–3.

[43] *Id.* at 3.

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] D.I. 236, Ex. 10 (Nine West First Response).

Bierman's allegations were "mistaken" and "speculat[ive]."[48] Nine West also stated it "already . . . disclosed" public reports regarding the Merger and Carve-Out Transactions that should satisfy Bierman's "anonymous inquiry."[49]

Bierman responded with a second Letter that again was addressed to Nine West and its counsel.[50] In his second Letter, Bierman "formally reiterat[ed]" the same requests he made in his first Letter.[51] Although he viewed Nine West's "continued refusal to disclose the requested information" as a "suggest[ion] that [Nine West] . . . violated" the indenture agreement, he did not make any additional allegations, warn of any different consequences, or press any new requests. He also did not contact Nine West again.[52] After Nine West rejected the second Letter,[53] neither Bierman nor his putative clients took action against Nine West.

**E. The Nine West Claims**

Nine West's assumption of the Company's pre-existing and transaction-based debt left it with a post-closing capital structure that comprised liabilities it ultimately could not satisfy without the equity it sold in the Carve-Out Transactions. Overly leveraged, Nine West faced insolvency. For that insolvency, Nine West's lenders first blamed, and then sued, Sycamore, alleging fraudulent transfers, breach of

---

[48] *Id.* at 1.
[49] *Id.* at 1–2.
[50] Second Bierman Letter at 1.
[51] *Id.* at 2. Bierman added the word "information" to the request he made in his first Letter. *Id.*
[52] *Id.*
[53] *See* D.I. 236, Ex. 12 (Nine West Second Response).

fiduciary duty, and various contractual breaches and business torts (the "Nine West Claims").

## 1. The Initial Demand

Through a 2017 demand letter, some of Nine West's creditors alleged Sycamore, "driven by an interest in monetizing" the Carve-Out Transactions, caused Nine West to "double [its] debt load" by drawing on revolving credit facilities Nine West could not repay.[54] The creditors further alleged Sycamore engaged in self-dealing, falsified Nine West's financial statements, and manipulated the value of the Carve-Out Transactions, all to conceal the extent of Nine West's leverage from lenders and to profit at their expense.[55] In the creditors' view, Sycamore's maneuvering amounted to a "particularly strong legal claim[]" for fraudulent transfer damages.[56] As a result, the creditors requested Sycamore to start "constructive discussions" with them to facilitate an "out-of-court resolution" that would "properly compensate" the creditors for their "valuable claims."[57] Otherwise, the creditors cautioned, they would "pursue the rights and remedies available" to them.[58]

Sycamore, believing the creditors' initial demand constituted a Claim under the Policies, sent notice of the demand to its insurers.[59]

---

[54] D.I. 236, Ex. 13 at 2–3.
[55] *Id.* at 5–8.
[56] *Id.* at 8–10.
[57] *Id.* at 14.
[58] *Id.*
[59] D.I. 236, Ex. 22.

## 2. The Bankruptcy Litigation

Approximately one year later, Nine West filed for Chapter 11 protection. During the Company's Chapter 11 proceedings, a committee of unsecured creditors representing Nine West's bankruptcy estate presented a proposed complaint against Sycamore that reiterated and added to the allegations made in the initial demand letter. The estate focused on the Carve-Out Transactions, which, in its view, diverted value from Nine West's creditors in favor of generating profit for Sycamore.[60] The estate sought $1 billion in

> (i) avoidance, recovery, or both, for (a) fraudulent transfers executed in connection with the Carve-Out Transactions, (b) self-dealing transactions, including working capital adjustment waivers and a "worthless stock deduction," and (c) certain loans Sycamore directed Nine West to obtain;

> (ii) damages for breach of fiduciary duty by Sycamore and its management for directing the Carve-Out Transactions, waivers, and deduction;

> (iii) damages under Delaware and Pennsylvania corporate statutes for illegal dividends and stock redemptions;

> (iv) unjust enrichment and related restitution for the Carve-Out Transactions;

> (v) damages for breach of contract due to the working capital adjustment waivers; and

> (vi) damages for tortious interference with contract.[61]

---

[60] D.I. 236, Ex. 14 ¶¶ 1–27.
[61] *Id.* ¶¶ 182–369.

## F. The Nine West Settlement

In exchange for dismissal of the Nine West Claims, Sycamore executed the Nine West Settlement. The Settlement was confirmed in Nine West's reorganization plan and required Sycamore to pay $120 million to the estate.[62]

To fund the Settlement, Sycamore sought coverage from the Insurers. The Insurers denied coverage. Lacking any immediate insurance proceeds with which to pay the settlement, Sycamore fronted the payment with (1) $25 million of its own cash and (2) $95 million from alternate sources of liquidity, including (i) $68 million from two Sycamore affiliates that was raised through asset sales and capital contributions; and (ii) $27 million from third-party lenders in the form of syndicated loans guaranteed by Sycamore.[63]

## G. This Litigation

To recoup $100 million of the Nine West Settlement, Sycamore brought this breach of contract and declaratory action, contending the Insurers wrongfully refused to provide coverage. In response, the Insurers raised numerous affirmative defenses based on certain policy terms.

Earlier in the case, Sycamore moved for partial judgment on the pleadings against one of the Insurers' defenses (the "Uninsurability Defense"), arguing

---

[62] D.I. 236, Ex. 15.
[63] D.I. 253, Dec. of Gary Holihan ¶¶ 13, 18–20.

17

Delaware law governed the Policies under a "law most favorable" provision and that, under Delaware law, the Nine West Settlement was not an uninsurable payment of restitution or disgorgement. The Insurers argued for the opposite conclusions, citing New York law and exceptions to enforcing a Delaware choice of law clause. On February 26, 2021, the Court issued a memorandum opinion that accepted Sycamore's arguments and held the Uninsurability Defense invalid as a matter of Delaware law.[64]

The parties pursued discovery and then filed the pending motions for summary judgment.[65] Through their independent and cross motions, the parties seek judgment as a matter of law on some of the Insurers' remaining defenses.[66] After the Court heard argument on the motions,[67] the parties completed supplemental briefing on intervening precedent,[68] at which time the case was submitted for decision.

**PARTIES' CONTENTIONS**

## A. Sycamore's Motion

In its motion for partial summary judgment, Sycamore argues all the Insurers' defenses that are based on the relatedness of the Nine West Claims and the Jones

---

[64] *See generally Sycamore I*, 2021 WL 761639.
[65] D.I. 107.
[66] D.I. 222, 226, 236, 240.
[67] D.I. 291.
[68] D.I. 301, 304.

18

Shareholder Suits fail because the two litigations are not "fundamentally identical." Sycamore contends the fundamentally identical "standard" is settled Delaware law and controls the interpretation of insurance terms that exclude coverage based on a claim's relatedness to another claim. Employing the fundamentally identical standard, Sycamore argues the Nine West Claims are covered because they concerned the Carve-Out Transactions and so did not involve the exact same subject as the Jones Shareholder Suits, which concerned the Merger.

As to the Bierman Letters, Sycamore maintains none of the Insurers' defenses is applicable because the Bierman Letters are not a "Claim." According to Sycamore, a request for information, without more, is not a "demand for monetary or non-monetary relief." On Sycamore's reading, the term "non-monetary relief" is meant to capture non-monetary legal or equitable remedies, *e.g.*, an injunction, not requests for information from private parties. Sycamore reasons a contrary reading would require insurance companies to pay for every information request, even innocuous ones, as long as the inquirer theoretically is adverse to the insured. Sycamore also contends the Bierman Letters are not a Claim because the "demand" Bierman made was not "against an Insured." Sycamore observes the Bierman Letters were addressed to Nine West, a non-Insured, not Sycamore.

In opposition, the Insurers dispute the fundamentally identical standard's legitimacy, arguing it is contrary to Delaware law to the extent it requires courts to

19

ignore the policy terms' plain meaning. To the extent a test is required, the Insurers urge the Court to adopt the "common nexus standard" or other more lenient standards applied in other jurisdictions because, in the Insurers' view, those tests are more faithful to the Policies' plain language. Ultimately, however, the Insurers urge the Court to focus on the Policies' language as written, contending the Nine West Claims and the Jones Shareholder Suits "arise out of" each other because they both concern Sycamore's alleged wrongdoing in connection with the Merger and the Carve-Out Transactions.

The Insurers also disagree with Sycamore's characterizations of the Bierman Letters. In the Insurers' view, the Bierman Letters not only request information, but also threaten litigation against both Sycamore and Nine West and allege Sycamore committed wrongdoing. Taken together, the Insurers contend the Bierman Letters are a demand for non-monetary relief against Sycamore.

## B. The Insurers' Motions

Through their joint motion, the Insurers first argue Sycamore did not incur Loss because third parties paid most of the Nine West Settlement on Sycamore's behalf. The Insurers contend, in satisfying the Settlement without paying for all of it personally, Sycamore was "absolved from payment" under the Policies.

The Insurers next argue the Bierman Letters are a Claim for the reasons discussed above in the context of their opposition to Sycamore's motion. Having

concluded the Bierman Letters are a Claim, the Insurers contend the Letters are interrelated with or fundamentally identical to the Nine West Claims because they both concern the Carve-Out Transactions.

Third, the Insurers argue the Warranty Letter acts as a "prior knowledge exclusion" that applies to an insured's knowledge of *any* acts or omissions, not just those an insured "reasonably expected" to produce a Claim. To make this argument, the Insurers posit each paragraph in the Warranty Letter must be considered independently. Read in that manner, the Insurers continue, the Warranty Letter's second paragraph does not contain or reference the reasonable expectation qualifier noted in the first paragraph. As a result, the Insurers argue they need only prove Sycamore had prior knowledge of "any" wrongdoing that produces a Claim. Using their burden of proof, the Insurers contend Sycamore had prior knowledge of the Nine West Claims even though Sycamore represented in the Warranty Letter that it did not.

Finally, Ironshore and Markel separately argue the specific wording of their own PPL Exclusions precludes coverage for the Nine West Claims. Both Insurers track the plain language of their Exclusions to contend the Nine West Claims arise out of the same or similar facts as the Jones Shareholder Suits. Both Insurers also use their separate motions as an additional opportunity to challenge the fundamentally identical standard.

21

In opposition, Sycamore argues personal payment of a settlement is not required for a settlement to qualify as Loss. Sycamore contends the Policies are "pay on behalf of" contracts that required the Insurers to pay for the Nine West Settlement as soon as Sycamore became "legally obligated to pay" for it. Relatedly, Sycamore asserts it was not "absolved" of that obligation simply because it fronted part of the payment with third-party funding. Sycamore reasons the Insurers' reading would enable insurance companies to deny coverage, force the insured to secure a fallback source of payment, and then claim the insured cannot obtain coverage because it found the means to cover the loss. Sycamore argues this rationale is contrary to insurance practice, the Policies' plain language, and precedent. As a result, Sycamore invites the Court to grant the plaintiffs summary judgment *sua sponte* on this defense.

As against the Bierman Letters, Sycamore reiterates its principal arguments, contending the Bierman Letters are not a Claim. Similarly, Sycamore reiterates its principal arguments against the PPL Exclusions, contending the Nine West Claims and Jones Shareholder Suits are not fundamentally identical.

Finally, Sycamore attacks the Insurers' reading of the Warranty Letter, contending their reading is contrary to principles of contract interpretation and would produce an absurd result that creates an exclusion not contemplated by the Policies. Sycamore argues the Warranty Letter must be enforced as a whole,

including where it imposes a reasonable expectation requirement. Sycamore contends the Insurers have failed to meet their burdens to show actual knowledge and reasonable expectation and, therefore, the Court should grant the plaintiffs judgment *sua sponte* on this defense. Alternatively, Sycamore asserts this defense involves factual issues not amenable to resolution at this stage.

## STANDARD OF REVIEW

This Court will grant summary judgment if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[69] In considering a motion for summary judgment, the Court must construe the record "in the light most favorable to the non-moving party."[70] The movant bears the initial burden of demonstrating "clearly the absence of any genuine issue of fact."[71] If the movant meets this burden, then the non-movant must show "there is a genuine issue for trial."[72] "If the facts permit reasonable persons to draw but one inference, the question is ripe for summary judgment."[73] Conversely, summary judgment is inappropriate "if there is a dispute as to a material fact or the inferences

---

[69] Del. Super. Ct. Civ. R. 56(c).
[70] *Merrill v. Crothall–Am., Inc.*, 606 A.2d 96, 99 (Del. 1992).
[71] *Brown v. Ocean Drilling & Expl. Co.*, 403 A.2d 1114, 1115 (Del. 1979).
[72] Del. Super. Ct. Civ. R. 56(e); *see, e.g.*, *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979).
[73] *Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995).

to be drawn therefrom."[74]  At this stage, the Court's role is to detect genuine factual issues, not to decide them.[75]

The rules governing independent motions for summary judgment apply equally to cross motions for summary judgment.[76]  Where cross motions for summary judgment are filed on a particular issue and neither party argues the existence of a genuine issue of material fact thereon, the Court may consider the motions as a stipulation for decision on the record submitted by the parties.[77]  But cross motions are not necessarily dispositive of whether material facts are in dispute.[78]  Even in the presence of cross motions for summary judgment, the Court must determine whether a factual dispute exists that precludes judgment as a matter of law.[79]

---

[74] *Vanaman v. Milford Mem'l Hosp., Inc.*, 272 A.2d 718, 720 (Del. 1970).

[75] *See, e.g.*, *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 783 (Del. 2012) ("[T]he court cannot try issues of fact on a Rule 56 motion but only is empowered to determine whether there are issues to be tried." (internal quotation marks omitted)); *see also Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1150 (Del. 2002) ("The test is not whether the judge considering summary judgment is skeptical that [the non-movant] will ultimately prevail.").

[76] *E.g.*, *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1050 (Del. Super. Ct. 2001).

[77] Del. Super. Ct. Civ. R. 56(h).

[78] *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997).

[79] *E.g.*, *Fasciana v. Elec. Data Sys. Corp.*, 829 A.2d 160, 166 (Del. Ch. 2003); *see also United Vanguard*, 693 A.2d at 1079 ("[A] party moving for summary judgment concedes the absence of a factual issue and the truth of the nonmoving party's allegations only for purposes of its own motion. . . . Thus, the mere filing of a cross motion for summary judgment does not serve as a waiver of the movant's right to assert the existence of a factual dispute as to the other party's motion." (citations omitted)); *see generally AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005) ("[I]f from the evidence produced there is a reasonable indication that a material fact is in dispute . . . summary judgment is not appropriate.  This is an axiom of judicial process and applies unless the parties have stipulated that the paper record shall constitute the trial record." (internal quotation marks and citations omitted)).

## ANALYSIS

Resolution of the parties' motions turns on the meaning of several disputed policy terms. Delaware law governs the Policies.[80] Under Delaware law, the principles of insurance contract interpretation are well-established and are grounded in the parties' intent, as expressed through their contractual language.

> Insurance contracts, like all contracts, are construed as a whole, to give effect to the intentions of the parties. Proper interpretation of an insurance contract will not render any provision illusory or meaningless. If the contract language is clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning. Where the language is ambiguous, the contract is to be construed most strongly against the insurance company that drafted it. A contract is not ambiguous simply because the parties do not agree on the proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings. Insurance contracts should be interpreted as providing broad coverage to align with the insured's reasonable expectations. Generally, an insured's burden is to establish that a claim falls within the basic scope of coverage, while an insurer's burden is to establish that a claim is specifically excluded. Courts will interpret exclusionary clauses with a strict and narrow construction and give effect to such exclusionary language only where it is found to be specific, clear, plain, conspicuous, and not contrary to public policy.[81]

Summary judgment is an effective tool to resolve disputes involving unambiguous contracts because "there is no need to resolve material disputes of

---

[80] *See Sycamore I*, 2021 WL 761639, at *5–11 (holding Delaware law applies to the Policies).
[81] *RSUI Indem. Co. v. Murdock*, 248 A.3d 887, 905–06 (Del. 2021) (cleaned up).

fact."[82]   As explained below, the Policies' unambiguous language does not support summary judgment in the Insurers' favor.

**A. Sycamore is entitled to summary judgment on the Insurers' defenses relating to the PPL and Prior Notice Exclusions, and the Interrelated Claims Provision.**

>    **1. The Nine West Claims and the Jones Shareholder Suits are not "Interrelated Claims."**

The Insurers' defenses based on the Interrelated Claims Provision, Prior Notice Exclusion, and PPL Exclusions require the Court to determine whether the Nine West Claims are related to an earlier claim or event.  Each of those provisions deploys similar phrasal verbs, such as "arising out of," "resulting from," "in consequence of," or "involving."[83]  Given that parity, the parties devote the bulk of their efforts to debating the proper standard for measuring the relatedness of two claims.

Each side, perhaps not surprisingly, urges the Court to apply a very different standard.  At one extreme, Sycamore offers the "fundamentally identical" standard, under which two Claims are not interrelated unless they concern the exact same subject.[84]  At the opposite end, the Insurers suggest a series of more lenient standards

---

[82] *Julius v. Accurus Aerospace Corp.*, 2019 WL 5681610, at *7 (Del. Ch. Oct. 31, 2019) (internal quotation marks omitted), *aff'd*, 2020 WL 6557830 (Del. Nov. 9, 2020); *cf. GMG Cap.*, 36 A.3d at 783 ("[W]here reasonable minds could differ as to a contract's meaning, a factual dispute results. . . . In those cases, summary judgment is improper." (citations omitted)).

[83] Policies, General Terms and Conditions §§ II.(D), I.(L), IV.(B)(1); Ironshore Policy at Endorsement #3; Markel Policy at SYC0150254.

[84] *E.g.*, *First Solar, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 2021 WL 2563023, at *4–5 (Del. Super. Ct. June 23, 2021) (summarizing applicable authority).

from inside and outside Delaware, including, for example, the "common nexus" standard. Under the common nexus standard, Claims are interrelated if they merely share material facts.[85]

The parties' extended treatment of relatedness tests, and decisions articulating such tests, overlooks that Delaware trial courts have been instructed to analyze contracts using a plain language framework that is based on general interpretive principles. As a matter of black letter law, Delaware courts must interpret unambiguous insurance policies according to their ordinary meaning.[86] Under binding Supreme Court precedent, a court may not "destroy or twist the words of a clear and unambiguous insurance contract."[87]

---

[85] *See AT&T Corp. v. Clarendon Am. Ins. Co.*, 2006 WL 1382268, at *14 (Del. Super. Ct. Apr. 13, 2006) (articulating standard), *rev'd in part sub nom.*, *AT & T Corp. v. Faraday Cap. Ltd.*, 918 A.2d 1104 (Del. 2007). In *Clarendon*, the trial court adopted a unitary Claim definition that treated an entire lawsuit as one Claim, regardless of how many counts were in that underlying lawsuit's complaint. Using that definition, the trial court proceeded to its common nexus analysis, which it imported from non-Delaware caselaw. *Id.* (citing *Seneca Ins. Co. v. Kemper Ins. Co.*, 2004 WL 1145830, at *6 (S.D.N.Y. May 21, 2004)). On appeal, the Supreme Court reversed the trial court's Claim definition, explaining that one lawsuit may, depending on the counts in the underlying complaint, allege multiple Claims. *Faraday Cap.*, 918 A.2d at 1109. Having clarified how to define Claims, the Supreme Court found further review unnecessary because the trial court's "other determinations . . . were based on the incorrect premise that each lawsuit constituted one claim." *Id.* at 1105. The Supreme Court's decision not to address the common nexus standard—which, presumably, was one of the trial court's "other determinations"—has led the parties to challenge that standard's precedential status. The Court, however, need not decide whether the Supreme Court jettisoned the common nexus standard along with the *Clarendon* court's Claim definition. For the reasons discussed below, the Policies' plain language governs, not a legal test.
[86] *E.g.*, *In re Solera Ins. Coverage Appeals*, 240 A.3d 1121, 1131 (Del. 2020); *In re Verizon Ins. Coverage Appeals*, 222 A.3d 566, 573–75 (Del. 2019).
[87] *In re Solera*, 240 A.3d at 1131 (internal quotation marks omitted).

Sycamore relies on a number of recent decisions by this Court that apply a "fundamentally identical" standard to policy exclusions that are based on the relatedness of claims.[88] This test seems to rest, at least in part, on decisional law that instructs this Court to interpret policy exclusions narrowly and in a manner consistent with an insured party's reasonable coverage expectations.[89] On the other hand, neither the Delaware Supreme Court nor any other jurisdiction has adopted "fundamental identity" as the standard governing all relatedness inquiries, regardless of the contractual language at issue. To apply indiscriminately that type of gloss to otherwise unambiguous policy language arguably could contravene Delaware law requiring this Court to interpret insurance policies according to their plain language and to avoid grafting public policy limitations into contracts in the absence of a policy pronouncement by the General Assembly.[90]

Ultimately, this thorny question likely will be resolved by the Delaware Supreme Court. In the meantime, rather than select among the various tests the

---

[88] *See generally First Solar*, 2021 WL 2563023; *Northrop Grumman Innovation Sys., Inc. v. Zurich Am. Ins. Co.*, 2021 WL 347015 (Del. Super. Ct. Feb. 2, 2021), *appeal refused on other grounds*, 2021 WL 1043988 (Del. Mar. 18, 2021); *Pfizer Inc. v. Arch Ins. Co.*, 2020 WL 5088075 (Del. Super. Ct. Aug. 28, 2020); *Pfizer Inc. v. Arch Ins. Co.*, 2019 WL 3306043 (Del. Super. Ct. July 23, 2019); *Med. Depot, Inc. v. RSUI Indem. Co.*, 2016 WL 5539879 (Del. Super. Ct. Sept. 29, 2016); *RSUI Indem. Co. v. Sempris, LLC*, 2014 WL 4407717 (Del. Super. Ct. Sept. 3, 2014), *appeal refused*, 2015 WL 82261 (Del. Jan. 6, 2015). For context, the adjectival phrase "fundamentally identical" first appeared in *United Westlabs, Inc. v. Greenwich Ins. Co.*, 2011 WL 2623962 (Del. Super. Ct. July 1, 2011) (corrected opinion), *aff'd on alternative grounds*, 2012 WL 628006 (Del. Feb. 28, 2012), on which all the cases collected herein rely.

[89] *See, e.g.*, *Murdock*, 248 A.3d at 906.

[90] *See, e.g.*, *id.* at 902–05; *In re Solera*, 240 A.3d at 1131; *In re Verizon*, 222 A.3d at 573–75; *Sycamore I*, 2021 WL 761639, at *11.

parties urge, I have confined my analysis to the Policies' plain language. Even under that language, which sweeps more broadly than the Insured's preferred test, the Jones Shareholder Suits and the Nine West Claims are not interrelated.

To begin, the Interrelated Claims Provision bars coverage for Claims "arising from" Interrelated Wrongful Acts.[91] Wrongful Acts are Interrelated if they "arise out of," "result from," "are in consequence of," or "in any way involve," "the same or related . . . facts, circumstances, situations, transactions or events."[92]

The Supreme Court has provided interpretive guidance for construing the undefined phrasal verbs that orient the Interrelated Claims Provision. In the insurance context, the Supreme Court has defined "arising out of" to mean "some meaningful linkage."[93] In doing so, the Supreme Court also approved a number of synonyms, including "originating from," "having its origin in," "growing out of," and "flowing from."[94] Following that interpretive approach, this Court has held "resulted from" likewise means originating from or having some meaningful linkage

---

[91] Policies at General Terms and Conditions II.(D).

[92] *Id.* at General Terms and Conditions I.(L).

[93] *Pac. Ins. Co. v. Liberty Mut. Ins. Co.*, 956 A.2d 1246, 1257 (Del. 2008); *Eon Labs Mfg., Inc. v. Reliance Ins. Co.*, 756 A.2d 889, 894 (Del. 2000).

[94] *Pac. Ins. Co.*, 956 A.2d at 1256 n.42 (internal quotation marks omitted); *see Premcor Refin. Grp., Inc. v. Matrix Serv. Indus. Contractors, Inc.*, 2009 WL 960567, at *7 (Del. Super. Ct. Mar. 19, 2009) (observing that, when the Supreme Court defined arising out of as some meaningful linkage, it "cited[] with favor" analogous definitions, including those noted above (internal quotation marks omitted)).

with.[95]  Those judicial definitions of "arising out of" and "resulting from" comport with dictionary definitions of comparable terms, suggesting all renderings reflect those terms' plain meaning adequately.[96]  Given this textual paradigm, and that the parties exhibited no textual intent otherwise,[97] the phrases "in consequence of" and "in any way involve" also must mean, in this context, originating from or sharing a meaningful linkage.[98]  Accordingly, the Policies at issue in this case do not bar two

---

[95] *Mumford & Miller Concrete, Inc. v. Marinis Bros, Inc.*, 2015 WL 19147431, at *5 (Del. Super. Ct. Apr. 16, 2015).

[96] *See Arise*, *Black's Law Dictionary* (11th ed. 2019) ("To originate; to stem (from)."); *Result*, in *id.* ("[T]o proceed as an outcome.").  The Supreme Court has approved use of dictionaries in construing undefined terms in insurance policies. *E.g.*, *Solera*, 240 A.3d at 1132.  Accordingly, the Court does so here and below.

[97] *Cf. Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354, 360 (Del. 2013) ("We give words their plain meaning unless it appears the parties intended a special meaning.").

[98] *See Sempris*, 2014 WL 4407717, at *6 (equating the phrase "in any way involving" with "arising out of" and observing that both terms require a meaningful linkage); *compare Consequence*, *Black's Law Dictionary* (11th ed. 2019) ("A result that follows as an effect of something that came before."), *and Involve*, Merriam-Webster (online ed.), www.merriam-webster.com/dictionary/involve ("[T]o require as a necessary accompaniment; to relate closely."), *with Arise*, *Black's Law Dictionary* (11th ed. 2019) ("To originate; to stem (from)."), *and Result*, in *id.* ("[T]o proceed as an outcome.").

     Arguably, "in consequence of" and "in any way involve" are narrower than "arising out of" and "resulting from" because "consequence" implies a direct causal relationship and "involve" implies an element of necessity.  In the coverage context, however, the Supreme Court has rejected narrow interpretations of undefined phrasal verbs.  *See Pac. Ins. Co.*, 956 A.2d at 1246 n.42 ("[A]rising out of is broader than caused by" and "encompass[es] a meaning broader than mere proximate cause." (internal quotation marks omitted)).  Given that context, the Court has adopted the broader of these terms' available definitions.  *See, e.g.*, *Tetragon Fin. Grp. Ltd. v. Ripple Labs Inc.*, 2021 WL 1053835, at *4 (Del. Ch. Mar. 19, 2021) (selecting definitions of undefined terms using a contextual approach); *accord Aveanna Healthcare, LLC v. Epic/Freedom, LLC*, 2021 WL 3235739, at *33 (Del. Super. Ct. July 29, 2021).  Although the resulting interpretation causes some redundancy, a construction that produces "some redundancy is acceptable" if the construction gives effect to the contract language and discharges the parties' intent. *In re IAC/InterActive Corp.*, 948 A.2d 471, 498 (Del. Ch. 2008) (internal quotation marks omitted). Notwithstanding surplusage concerns, redundant interpretations "are preferable" if construing undefined terms otherwise would contravene the parties' intent.  *Id.* at 498 n.109; *accord Franco v. Avalon Freight Servs. LLC*, 2020 WL 7230804, at *3 & n.30 (Del. Ch. Dec. 8, 2020); *see U.S. W., Inc. v. Time Warner*

30

Claims as interrelated unless there is a meaningful link connecting the factual allegations that formed the bases of the Wrongful Acts underlying each Claim.

Applying that standard, the Nine West Claims do not originate from the Jones Shareholder Suits. The Jones Shareholder Suits sought to block the Merger or increase its price. They were derivative actions designed to ensure Jones would not be sold unless its stockholders received the highest payout available to them. As such, the stockholders accused the Board of breaching its fiduciary duties by proposing a transaction that only would benefit the individual directors and officers.

As their headline allegation, the stockholders claimed the proxy solicitations and voting process that led to the Merger were unfair, based on incomplete information, and would result in a low per-share price. Specifically, they contended the Board, aided and abetted by Sycamore, withheld accurate valuation data about the Company's performance that should have been disclosed to the stockholders. As further support for their theories, the stockholders cited the Board's failure to obtain better conditions and bids during the Merger's go-shop phase and argued the Board

*Inc.*, 1996 WL 307445, at \*15 (Del. Ch. June 6, 1996) ("While redundancy is sought to be avoided in interpreting contracts, this principle of construction does not go so far as to counsel the creation of contract meaning for which there is little or no support in order to avoid redundancy."). Here, by using four, virtually synonymous phrasal verbs, the parties took a belt-and-suspenders approach to ensuring this exclusion applies whenever two Claims are interrelated. In other words, the parties accepted some redundancy to guarantee their contractual expectations would be fulfilled. *See iBio, Inc. v. Fraunhofer USA, Inc.*, 2016 WL 4059257, at \*11 (Del. Ch. July 29, 2016) (finding a "somewhat redundant" provision not meaningless "to the extent" it gave the parties "additional comfort").

blindly accepted Sycamore's option instead of maximizing equity with alternative investment opportunities. As one of those opportunities, the stockholders cited the Carve-Out Transactions. The stockholders did not allege the Carve-Out Transactions were wrongful, or that they would harm the Company or render it insolvent. To the contrary, the stockholders alleged the Carve-Out Transactions' value had been understated. According to the stockholders, the Board should have used the Carve-Out Transactions to boost the Company's goodwill instead of transferring the Carve-Out Transactions' value to Sycamore. Properly understood, the Carve-Out Transactions were cited as further evidence of a fiduciary violation, not of a scheme to defraud creditors or bankrupt the company.

In contrast, the Nine West Claims involved different allegations and different Wrongful Acts. The Nine West Claims focused on Sycamore's alleged wrongdoing, not the Board's alleged wrongdoing. To that end, the creditors challenged the Carve-Out Transactions, not the Merger. Whereas the Jones Shareholder Suits sought to avoid the Merger as improperly approved, the Nine West Claims sought to avoid the Carve-Out Transactions as fraudulent conveyances. Specifically, Nine West's creditors contended the Carve-Out Transactions rendered Nine West insolvent and diverted value away from Nine West's estate. In support of that contention, the estate argued, for example, Sycamore engaged in self-dealing by waiving working capital adjustments that would have increased Nine West's post-Merger equity and

by taking stock deductions and declaring dividends that extracted from Nine West capital it could have used to pay its debts or continue as a going concern. None of these Wrongful Acts originated in the theories alleged or the facts challenged by the Jones Shareholder Suits.

To the Jones Shareholder Suits plaintiffs, the Carve-Out Transactions would have made Jones more valuable. But to the Nine West Claims plaintiffs, the Carve-Out Transactions made Nine West less valuable and exacerbated its leverage. The misleading proxy materials and poor planning the Jones Shareholder Suits ascribed to the Board could not be ascribed, as well, to Sycamore, as it was not responsible for obtaining the Merger's approval. In other words, the Wrongful Acts integral to the Jones Shareholder Suits, pre-Merger, were not necessary for sustaining the Nine West Claims, which targeted Sycamore's post-Merger activity. Had the Wrongful Acts underlying the Jones Shareholder Suits never occurred, Nine West's creditors still would have been able to bring the Nine West Claims. Accordingly, the Nine West Claims bore no meaningful linkage with the Jones Shareholder Suits.

To reach the opposite result, the Insurers propose a definition of arising out of that would bar coverage for the Nine West Claims simply because they share background facts in common with the Jones Shareholder Suits. But, to bar coverage, the Policies' plain language requires a *meaningful* link that connects the factual circumstances underpinning the alleged Wrongful Acts challenged in each litigation.

On that plain language, it is not sufficient for two Claims to mention some of the same facts. That both the Merger and the Carve-Out Transactions were noted in each litigation might, at a high level of abstraction, illustrate a "link." But that link is not meaningful enough to trigger the Interrelated Claims Provision. Two Claims do not "involve" and are not "consequence[s] of" the same Wrongful Acts merely because the underlying claimants, to aid readers in understanding and situating their allegations, recounted the history of two temporally related but substantively unassociated transactions. The fact that the Merger was a precursor to the Carve-Out Transactions, or that the Carve-Out Transactions were cited in the Jones Shareholder Suits, is not dispositive because the Carve-Out Transactions did not form "the basis" of the Wrongful Acts alleged in the Jones Shareholder Suits, just as the Merger did not form "the basis" of the Wrongful Acts alleged in the Nine West Claims.[99]

Moreover, the Insurers' proffered interpretation of the phrase meaningful linkage would undermine the Interrelated Claims Provision's purpose. As a coverage provision, the Interrelated Claims Provision must be construed to safeguard the insured's reasonable expectation of broad coverage.[100] Indeed, the Supreme Court conceived the term meaningful linkage in the coverage context and

---

[99] *Eon Labs*, 756 A.2d at 893.
[100] *See Murdock*, 248 A.3d at 906.

instructed lower courts to implement it broadly, where possible, to find coverage.[101]

The Insurers' reading, however, treats the Provision's arising out of language as if it were exclusionary. That is not a reasonable reading of the Policies.

In sum, the Nine West Claims and the Jones Shareholder Suits are not Interrelated Claims. Accordingly, the Insurers' Interrelated Claims Provision defense fails as a matter of law.

**2. The Prior Notice Exclusion does not bar coverage for the Nine West Claims.**

**a. The Nine West Claims do not arise out of the Jones Shareholder Suits.**

The Insurers' Prior Notice Exclusion defense fails largely for the same reasons. The Prior Notice Exclusion excludes coverage for "Loss in connection with any Claim made against an Insured . . . arising out of [or] resulting from . . . any fact, circumstance, situation, transaction, event . . . or Wrongful Act" that was noticed under an earlier policy. Given the Exclusion's use of arising out of and resulting from, the same meaningful linkage analysis undertaken above applies equally here. By consequence, the Prior Notice Exclusion does not bar coverage for the Nine West Claims because they did not originate from the Jones Shareholder Suits. The Insurers' defense based on this Exclusion therefore fails for this reason alone.

---

[101] *See Pac. Ins. Co.*, 956 A.2d at 1256–57 & n.42.

The Insurers oppose this conclusion with an unpersuasive reading of the Prior Notice Exclusion. Citing the disjunctive "or" separating the Exclusion's facts and circumstances clause from the term Wrongful Act, the Insurers contend this Exclusion, unlike the Interrelated Claims Provision, applies whenever two Claims share any facts, even if those facts do not form shared Wrongful Acts. But the Insurers overlook the terms arising out of and resulting from. The Prior Notice Exclusion's use of arising out of and resulting from reaches the entire text, not just the term Wrongful Act. Properly construed, the Exclusion does not bar coverage whenever two Claims share any facts. Instead, the Exclusion bars coverage if two Claims originate from the same or similar facts. As explained, however, the Nine West Claims do not originate from the Jones Shareholder Suits simply because they share background facts. The significant facts that make them Claims (*i.e.*, the facts that state Wrongful Acts) are not shared at all.

### b. The 2014 Policy did not "afford[] coverage" for the Nine West Claims.

Still, even if the Court credited the Insurers' reading, this Exclusion would not apply. To bar coverage, the Prior Notice Exclusion additionally requires that the Claim be "afford[ed] coverage" by an earlier policy. Dictionaries define "afford" as "to make available, give forth or to provide naturally or inevitably"[102] and as "to

---

[102] *Afford*, Merriam-Webster (online ed.), www.merriam-webster.com/dictionary/afford (last visited Aug. 17, 2021).

provide somebody with something."[103]  Given that the purpose of this Exclusion is

to prevent double recovery, affords coverage must mean "provides" coverage.  For

the Exclusion to apply, then, Sycamore's 2014 Policy must have paid for the Nine

West Claims.  There is no dispute, however, that the 2014 Policy did not pay for the

Nine West Claims.  Indeed, the Policies' primary insurer, who also was the primary

insurer of the 2014 Policy, paid base coverage for the Nine West Claims,[104]

prompting this action against the Insurers for those Claims' excess coverage.[105]

Accordingly, the Prior Notice Exclusion fails for this reason as well.

The Insurers advance a definition of "afford" that does not survive strict

construction.  In the Insurers' view, affords coverage means "possibly" or

"theoretically" provides coverage.  Using their definition, the Insurers contend, as

long as the 2014 Policy might have covered the Nine West Claims, coverage is

barred under the Policies.  But that ranging definition fails to capture the purpose of

---

[103]*Afford*, Oxford Learner's Dictionaries (online ed.), www.oxfordlearnersdictionaries.com/us/definition/english/afford (last visited Aug. 17, 2021).
[104] D.I. 236, Dec. of Gary Holihan ¶ 38.
[105] The Insurers attempted in a half-paragraph to create a factual dispute on this point by observing that the 2014 Policy is not in the record.  D.I. 253 at 18.  But, given that the Policies' primary insurer covered the Nine West Claims, the record permits only one inference: the 2014 Policy did not cover the Nine West Claims.  *See, e.g.*, *Brzoska*, 668 A.2d at 1364 (holding that summary judgment may be granted where factual inferences do not support the non-movant).  Inferring from the absence of a record that the record does not exist would be unsound.  More importantly, inferring that the primary insurer of multi-million dollar management liability insurance policies negotiated for sophisticated investment funds would pay for the Nine West Claims twice would be unreasonable.  The Court will not on summary judgment "draw unreasonable inferences in favor of the non-moving party."  *Elenza, Inc. v. Alcon Labs. Holding Corp.*, 183 A.3d 717, 721 (Del. 2018) (internal quotation marks omitted).

37

the Prior Notice Exclusion, which is to prevent Sycamore from obtaining coverage under the Policies for a Claim that already had been paid for by a prior policy. There would be no reason to draft an exclusion that combats double recovery if the exclusion could apply even in the absence of double recovery.

The Insurers were required to show their reading of this exclusion was the only reasonable one.[106] They did not. Accordingly, their defense fails.

### 3. The PPL Exclusions do not apply.

Finally, the Insurers' identical PPL Exclusions do not bar coverage. Those Exclusions bar coverage for Claims "made against the Insured . . . arising from . . . any demand, suit, or other proceeding pending, or order, decree or judgment entered against any Insured prior to December 31, 2016, or the same or substantially the same fact, circumstance or situation underlying or alleged therein."[107] Again, to be excluded, the Nine West Claims must originate in (*i.e.*, "aris[e] from") the factual circumstances that formed the Jones Shareholder Suits. Here, however, for the reasons explained previously, they do not.

In search of a way around the governing analysis, the Insurers suggest their PPL Exclusions' "same or substantially the same fact" clause requires a different interpretation than the Interrelated Claims Provision. In the Insurers' view, that

---

[106] *E.g.*, *Smith v. Liberty Mut. Ins. Co.*, 201 A.3d 555, 571 (Del. Super. Ct. 2019).
[107] Ironshore Policy at Endorsement #3; Markel Policy at SYC0150254.

clause permits exclusion based on any minor resemblances between two Claims. But, as before, that clause is controlled by the "arising from" language. As a result, its application is defeated by the underlying facts. Moreover, the PPL Exclusions, unlike the Interrelated Claims Provision, require strict construction. It therefore follows that, if coverage is not barred by the Interrelated Claims Provision, then coverage cannot be excluded by the PPL Exclusions—which use the same verbal phrasing and fact-based clauses—either.

In sum, the Insurers' defenses fail to the extent they would bar coverage for the Nine West Claims as arising out of or resulting from the Jones Shareholder Suits. Accordingly, Sycamore's motion is granted and the Insurers' motions are denied.

**B. Because the Bierman Letters are not a Claim, Sycamore is entitled to summary judgment against the Insurers' Interrelated Claims defense relating to the Bierman Letters.**

The Insurers next seek to bar coverage for the Nine West Claims as interrelated with the Bierman Letters. Sycamore contends this defense fails *ab initio* because the Bierman Letters are not a "Claim." Resolution of this defense, therefore, requires interpretation of the Claim definition. For the reasons discussed below, the Bierman Letters are not a Claim. A private party's request for information from an insured's portfolio company, without more, is not a "demand for . . . non-monetary relief" made "against" an insured. Accordingly, the Insurers' defense fails.

**1. The Bierman Letters are not a "demand for . . . non-monetary relief."**

39

The Policies define a Claim, in relevant part, as a "demand for monetary or non-monetary relief (including, but not limited to, injunctive relief) commenced by receipt of such demand."[108] The Insurers do not argue the Bierman Letters demanded monetary relief. As a result, the Bierman Letters cannot be a Claim unless they demanded "non-monetary relief."

The term "non-monetary relief" is not defined. But context clarifies its meaning. The Policies' inclusion of "injunctive relief" as an example of non-monetary relief indicates the parties' intent to define the term "non-monetary relief" as non-monetary legal or equitable redress, *i.e.*, a remedy available in court, rather than a less technical form of reparation.[109] That "monetary relief" has been

---

[108] Policies at General Terms and Conditions § I.(D)(1).

[109] *E.g.*, *City of Wilmington v. Wilmington FOP Lodge # 1*, 2004 WL1488682, at *5 (Del. Ch. June 22, 2004) (using example included with an undefined term to define that term); *see Penton Bus. Media Holdings, LLC v. Informa PLC*, 252 A.3d 445, 461 (Del. Ch. 2018) ("When established legal terminology is used in a legal instrument, a court will presume that the parties intended to use the established legal meaning of the terms."); *Viking Pump, Inc. v. Liberty Mut. Ins. Co.*, 2007 WL 1207107, at *13 (Del. Ch. Apr. 2, 2007) ("[W]here a word has attained the status of a term of art and is used in a technical context, the technical meaning is preferred over the common or ordinary meaning."); *see also City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993) ("If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent."); *see generally Relief*, *Black's Law Dictionary* (11th ed. 2019) ("The redress or benefit, esp. equitable in nature (such as an injunction or specific performance, that a party asks of a court — Also termed *remedy*."); *Remedy*, in *id.* ("The means of enforcing a right or preventing or redressing a wrong; legal or equitable relief."); *Injunction*, in *id.* ("A court order commanding or preventing an action.").

construed to mean a request for money or damages to redress a legally cognizable wrong reinforces this interpretation.[110]

Under this plain language, the Bierman Letters did not demand non-monetary relief. Instead, the Bierman Letters sought to verify an allegation that the Merger and Carve-Out Transactions violated a sale restriction in an indenture agreement between Nine West and certain noteholders. To verify or dispel that allegation, Bierman asked Nine West to "provide . . . documents and information sufficient to establish the timing and order of the Merger [and the Carve-Out Transactions] . . . as well as documents sufficient to set forth what assets were conveyed from what entities as part of the [Carve-Out Transactions]."[111] The Bierman Letters did not claim a right to the information that could be redressed by court order if not voluntarily tendered. Put differently, the Bierman Letters did not demand relief, but instead requested materials that might discover "evidence" which, in turn, potentially could lead to a remedy "should any action be taken"[112] someday.

A private party, without a claim of right, generally cannot enforce compliance with, or assert penalties for denying, an information request. In contrast, a regulatory, adjudicative, or law enforcement agency generally has such power. That

---

[110] *See Med. Depot*, 2016 WL 5535879, at *8; *First Bank of Del., Inc. v. Fid. & Deposit Co. of Md.*, 2013 WL 5858794, at *3–4 (Del. Super. Ct. Oct. 30, 2013).
[111] Second Bierman Letter at 2.
[112] *Id.*

distinction, which is central to whether a written inquiry "commences" a "demand" for non-monetary relief "upon receipt,"[113] has led courts to find requests for information do not constitute demands for non-monetary relief when made by a private party, like Bierman, rather than a government entity.

*Conduent State Healthcare, LLC v. AIG Insurance Company*[114] explored this distinction. There, this Court considered whether an information request from a state attorney general's office sent to investigate the insured's suspected participation in Medicaid fraud constituted a demand for non-monetary relief. In considering the question presented, the court presupposed similar information requests made by private parties seeking to uncover wrongdoing would not amount to a demand for non-monetary relief.[115] The court then evaluated a "split in authority" on the issue, and ultimately adopted decisions that held government investigative devices, such as information requests, constitute demands for non-monetary relief.[116]

In reaching that conclusion, the court noted insureds cannot simply decline to cooperate with government investigations. Otherwise, insureds would risk liability (*e.g.*, criminal sanctions) for the very thing investigated. The court therefore

---

[113] Policies at General Terms and Conditions § I.(D)(1).

[114] 2019 WL 2612829 (Del. Super. Ct. June 24, 2019). As noted below, this Court's recent decision in *Guaranteed Rate, Inc. v. Ace Am. Ins. Co.*, 2021 WL 3662269 (Del. Super. Ct. Aug. 18, 2021), adopted *Conduent's* reasoning.

[115] *Conduent*, 2019 WL 2612829 at \*2–3 (distinguishing authority that treated government information requests as equivalent with similar requests from private parties).

[116] *Id.* at \*4; *accord Guaranteed Rate*, 2021 WL 3662269, at \*2.

reasoned that information requests made by law enforcement agencies constitute demands for non-monetary relief because, as opposed to "other entities," regulatory bodies "could compel compliance without judicial intervention."[117] In other words, when the government targets an insured for information relevant to an investigation of possible wrongdoing, the "distinction" between "investigating" wrongdoing and "alleging" wrongdoing is "without difference" for coverage purposes.[118] As a practical matter, the court observed, the government initiates a "claim" simply by imposing its authority on the insured.[119] In contrast, when a private party probes for wrongdoing, it must make a demand "sufficient to trigger coverage" under a claim of right because private parties lack the government's inherent police power.[120]

Bierman did not make a demand sufficient to trigger coverage. The Bierman Letters did not assert a claim of right to documents that publicly were disclosed and concerned a deal to which the noteholders were not parties. The Bierman Letters, instead, anchored their information request to the indenture agreement's sale restrictions, which allegedly established a contract right that could be breached independently, *i.e.*, without the desired disclosures. Confirming the noteholders

---

[117] *Conduent*, 2019 WL 2612829, at *4.

[118] *Id.* at *5.

[119] *Id.* at *4–6; *accord Guaranteed Rate*, 2021 WL 3662269, at *2 ("For the purposes of determining coverage [for a government information request], there is no distinction between the investigation of, or actually alleging, an unlawful act.").

[120] *Id.* at *5.

lacked inherent authority to compel compliance without judicial intervention, Bierman abandoned his pursuit when Nine West refused his requests.

In an effort to avoid this result, the Insurers marshal a phalanx of stray statements in the Bierman Letters and argue, because the Letters were "threatening," asked that records be preserved, and suggested the possibility of future litigation, the Letters demanded non-monetary relief.[121] For this contrary proposition, the Insurers cite cases from various jurisdictions that, in the Insurers' view, hold litigation exposure coupled with a document request constitutes a Claim.

But the Insurers' theory equates alleging a Wrongful Act with seeking relief from that Act. By contrast, the Policies distill the Claim definition into a wrongdoing element *and* a remedy element.[122] Under the Policies, demanding relief, without identifying a wrongdoing, is not a Claim. Conversely, it follows that identifying a wrongdoing, without demanding relief, also is not a Claim. Given this structure, the parties understood that raising the prospect of litigation, even in an ominous tone, necessarily is not equivalent with requesting in advance the act or asset that prospective litigation would be designed to award.

That aside, at least two problems with the Insurers' arguments remain. First, the decisions the Insurers cite construed different policy language and either

---

[121] D.I. 240 at 28–32.
[122] *See, e.g.*, Policies at Coverage Part § 1.

44

involved an information request packaged with a demand for money[123] or with language stating or implying injunctive relief.[124] The Bierman Letters fit neither category.

Second, and more importantly, the Insurers' reading would widen the scope of the Claim definition unreasonably, resulting in impractical consequences for the insurance industry. If the Court endorsed the Insurers' interpretation, insureds would be required to give notice of every single request for documents, however

---

[123] *See Herron v. Schutz Foss Architects*, 935 P.2d 1104, 1108–09 (Mont. 1997) ("[T]he [letter's] text, on its face, indicates that the Herrons were seeking compensatory payment. . . . As the District Court pointed out in its order, why else would a plaintiff's lawyer write to an alleged tort-feasor, ask him to contact his insurance carrier and say a claim exists, other than to make a demand for money damages." (alteration and internal quotation marks omitted)); *Berry v. St. Paul Fire & Marine Ins. Co.*, 70 F.3d 981, 982 (8th Cir. 1995) ("In our view, anyone receiving this letter would know that Mr. Berry was claiming that he was owed money."); *Rentmeester v. Wis. Lawyers Mut. Ins. Co.*, 473 N.W.2d 160, 163 (Wis. Ct. App. 1991) ("The letter contained a demand for money for the financial loss suffered by the Rentmeesters as a result of the alleged error in drafting the land contract."); *Chartis Specialty Ins. Co. v. Restoration Contractors, Inc.*, 2010 WL 3842372, at *4 (D. Minn. Sept. 27, 2010) ("The letters state that Dolan represents J.W. in a 'claim for injuries she sustained,' that her injuries resulted from Clean Response's services, and that the letter should be forwarded to Clean Response's insurance company as soon as possible. Although the letters . . . did not expressly demand payment or refer to a specific monetary amount, their meaning was [to demand money.]").

[124] *See Eighth Floor Promotions, L.L.C. v. Cincinnati Ins. Co.*, 71 N.E.3d 1262, 1271–72 (Ohio Ct. App. 2016) (finding "audit request" that requested the insured "not attempt to enter into negotiations with any" software providers who may have sold the insured infringing software a demand for non-monetary relief); *Weaver v. Axis Surplus Ins. Co.*, 2014 WL 5500667, at *8–11 (E.D.N.Y. Oct. 30, 2014) (defining demand for non-monetary relief in the terms discussed above and concluding letter from government entity that requested, among other things, "an injunction" requiring insured to "cease all offers and sales of [a] business opportunity" constituted a demand for non-monetary relief); *Anderson–Tulley Co. v. Fed. Ins. Co.*, 2007 WL 9643297, at *1, *5 (W.D. Tenn. Aug. 7, 2007) (holding a letter that requested company refrain from issuing dividends beyond a "minimum level" in context of an impending fiduciary duty lawsuit constituted a demand for non-monetary relief). *Cf. Zurich Am. Ins. Co. v. Syngenta Crop Prot., LLC*, 2020 WL 5237318, at *8 (Del. Super. Ct. Aug. 3, 2020) (finding a letter that contained "an unclear or amorphous threat of future litigation" not "sufficient to constitute a claim" under the policy).

attenuated. Not only would such a duty inundate insurers with coverage requests, and likely produce picayune disputes over how "threatening" a particular request is, but also, as this case demonstrates, such notice could be weaponized against the insured to bar coverage based on other exclusions in the policy. Neither party would benefit from such a ruling. The Court, therefore, declines to issue one.

**b. The Bierman Letters are not a Claim "against" Sycamore.**

Separately, even if the Bierman Letters did demand non-monetary relief, the Insurers' defense still would fail. The Policies provide Claims are not truly Claims unless they are made "against" Sycamore and accuse Sycamore of Wrongful Acts.[125] Although undefined, "against," in the context of a Claim, most naturally means "in opposition or hostility to."[126]

Applying that language, any Claim stated by the Bierman Letters is in opposition or hostility to Nine West, not Sycamore. The Letters were addressed to Nine West and its counsel and accused Nine West, as successor to the Jones Group, of breaching an indenture agreement by wrongfully transferring substantially all its assets. As a result, the Bierman Letters demanded information and documents from Nine West, not Sycamore. The Bierman Letters did not claim Sycamore breached the indenture agreement, let alone was a party to it, or that Sycamore had any

---

[125] Policies at Coverage Part § I.
[126] *Against*, Merriam-Webster (online ed.), www.merriam-webster.com/dictionary/against (last visited Aug. 20, 2021).

information relevant to interpreting that contract. For those reasons, the Insurers' counterargument, which asserts Sycamore received the Letters and Bierman impliedly accused Sycamore of wrongdoing in using the word "affiliate," is not persuasive. Even if Sycamore were notified of or alluded to in allegations directed toward its portfolio company, the Bierman Letters did not, in any reasonable sense, make demands "against" Sycamore that would remedy an alleged breach of an agreement between the noteholders and Nine West.

In sum, the Bierman Letters are not a Claim. The Insurers' Interrelated Claims Provision defense therefore fails for that additional reason. Accordingly, Sycamore's motion is granted and the Insurers' motion is denied.

## C. Under the Policies, the entire Nine West Settlement is a covered Loss.

The foregoing resolves the parties' cross-motions. Through their independent motions, the Insurers raise two additional defenses. Their first defense, the so-called "No Loss" defense, concerns the way Sycamore financed the Nine West Settlement.

After the Insurers denied coverage, Sycamore paid $95 million of the $120 million Nine West Settlement with third-party funding. The Insurers seize on that arithmetic to contend, because Sycamore paid only $25 million toward the Settlement using its own cash, it was "absolved from payment" for the $95 million, resulting in an amount below the Insurers' respective attachment points. In making this argument, the Insurers do *not* dispute the Settlement would be a Loss if it had

47

been left outstanding. As a result, the Insurers' theory posits that, because Sycamore was able to pay the Nine West Settlement without them, it cannot obtain "double" coverage through this litigation.

The Insurers' arguments run contrary to the Policies' purpose, the plain contractual language, and binding Supreme Court precedent. The entire Nine West Settlement is covered by the Policies, regardless of whose money was used to pay for it once the Insurers denied coverage.

**1. Sycamore was not "absolved from" paying the Nine West Settlement merely because it resorted to alternate funding sources to pay for the Settlement when the Insurers denied coverage.**

The Policies are "pay on behalf of" insurance policies. By using "pay on behalf of" language, insurance contract parties agree an insured need not pay for Loss first and then seek coverage in the form of reimbursement.[127] Instead, "pay on behalf of" language requires an insurer to cover Loss even if the insured has not fronted payment for it. Consistent with the Policies' purpose, the Insurers agreed to cover Loss, defined in part as settlements, on Sycamore's behalf as soon as Sycamore becomes "legally obligated to pay" for such Loss.[128] This language does not require Sycamore to pay for Loss first before seeking or obtaining coverage.

---

[127] *See generally, e.g.*, *Reimbursement Policies*, Int'l Risk Mgmt. Inst., www.irmi.com/insurance-definitions/reimbursement-policies (last visited Aug. 18, 2021).
[128] Policies at General Terms and Conditions § I.(O).

The Nine West Settlement was confirmed in Nine West's Chapter 11 reorganization plan. At that point, Sycamore, by court order, became "legally obligated to pay" for the Settlement. As a settlement, the Nine West Settlement plainly meets the Policies' definition of Loss. As a Loss, the Insurers, absent an exclusion or other contractual bar, had a duty to pay for the Settlement on Sycamore's behalf.

To resist this straightforward conclusion, the Insurers argue Sycamore did not incur Loss. According to the Insurers, because Sycamore did not use its personal funds to satisfy the Settlement's *entire* $120 million cost, Sycamore was, under the Policies, "absolved from" paying a Loss. But the Policies' plain language does not require Sycamore to pay for Loss personally (or at all) before receiving coverage. To the contrary, the Insurers each agreed a Loss would not lose its status as Loss if Sycamore or someone else happened to pay for the it before the Insurers provided coverage.[129]

Aside from contradicting express language in which they agreed the identity of a Loss's payor would be irrelevant to coverage, the Insurers' argument misconstrues the Loss definition. The Policies define Loss as an obligation to pay, not as an act of payment. By definition, a "Loss" is a claimant's right to receive payment from the insured, not a business "loss" the insured incurs in making that

---

[129] Ironshore Policy at Endorsement #3; Markel Policy at SYC0150254.

payment. Properly construed, therefore, an act of payment—whether taken by the insured or a third party—has no bearing on, and does not change, the reality of Loss. By consequence, the Nine West Settlement did not lose its status as Loss because third parties supplied capital to Sycamore. Indeed, had Sycamore's alternate sources of funding rescinded their pledges before the funding had been remitted to Nine West's estate, Sycamore would have remained liable for the deficiency. To the extent the Insurers argue otherwise, they confuse advancement with indemnification. Advancing payment for a Loss is not the same as indemnifying that Loss.[130]

With the Loss definition viewed from the proper lens, Loss persists unless Sycamore is "absolved from" paying for it.[131] The phrase "absolved from," however, also does not support the Insurers' argument. Because the "absolved from" clause functions as an exclusion from the Loss definition, it cannot apply unless Sycamore no longer legally is obligated to pay the otherwise covered Loss. In this context, then, the word "absolved" most naturally means "released."[132] Without a release, the Insurers could provide coverage to which Sycamore no longer is entitled.

Given that definition, Sycamore's Loss would not have been absolved unless the estate released Sycamore from its obligation to pay for the Settlement. In that

---

[130] *See Kaung v. Cole Nat'l Corp.*, 884 A.2d 500, 509–10 (Del. 2005) (explaining distinction and observing advancement is "correlative" of, but not equivalent with, a "discrete and independent" coverage right).
[131] Policies at General Terms and Conditions § I.(O)(3).
[132] *See Absolve*, *Black's Law Dictionary* (11th ed. 2019).

case, there would be no Loss—Sycamore no longer legally would be obligated to pay for the $120 million. But the estate did not forgo its settlement award. Accordingly, under the Policies' plain language, Sycamore was not absolved from payment.

The Insurers' own authorities confirm an insured is not "absolved from" Loss unless the underlying claimant forfeits its right to receive payment from the insured. For example, in *U.S. Bank National Association v. Federal Insurance Company*,[133] the United States Court of Appeals for the Eighth Circuit held an insured was "absolved from payment" where the insured executed an "assignment agreement" with a judgment creditor through which the creditor released the insured from a duty to pay for the award in exchange for pursuing the insured's insurers for payment instead.[134] No such agreement was executed here.

Similarly, in *Holmes Group, Inc. v. Federal Insurance Company*,[135] the United States District Court for the District of Massachusetts held an insured was "absolved from payment" where the insured executed a settlement agreement with the claimant in which the parties included a "covenant not to collect" provision that

---

[133] 664 F.3d 693 (8th Cir. 2011).
[134] *Id.* at 697–700.
[135] 2005 WL 4134556 (D. Mass. Oct. 5, 2005).

prevented the claimant from seeking payment from the insured.[136]  The Nine West

Settlement did not contain an analogous provision.

Finally, in *Liberty Mutual Insurance Company v. Electronics for Imaging,*

*Inc.*,[137] the Superior Court of California held a settlement agreement that provided

no recourse to the insureds for the settlement's cost "absolved" the insureds from

paying for the settlement.[138]  The Nine West Settlement, in contrast, provided the

creditors recourse exclusively to Sycamore.  As such, under the Policies, Sycamore

was not absolved from payment because it obtained third-party funding to pay part

of the Nine West Settlement after the Insurers denied coverage.

### 2. The Insurers' No Loss defense is inconsistent with Delaware law.

In addition to being unsupported by the Policies' plain language, the logic

animating the Insurers' No Loss defense has been rejected by the Supreme Court.

---

[136] *Id.* at *17–18.

[137] D.I. 234, Ex. LL (2011 Cal. Super. LEXIS 16301 (Cal. Super. Ct. Mar. 10, 2011)).

[138] *Id.* at *5–13.  The Insurers also cite a case in which the United States Court of Appeals for the Ninth Circuit, applying "California case law," held an insured could "not obtain double recovery" "for the same loss" from an insurer when the insured already had received contractual indemnification from a third party.  *Pan Pac. Retail Props., Inc. v. Gulf Ins. Co.*, 466 F.3d 867, 878–79 (9th Cir. 2006), *superseded on other grounds*, 471 F.3d 961 (9th Cir. 2006).  That decision not only does not interpret an "absolved from payment" exclusion, but also involves different facts and different legal principles.  *See, e.g.*, *id.* at 879 ("[W]here[, as here,] there are several policies of insurance on the same risk and the insured has recovered the full amount of its loss from one or more, . . . the insured has no further rights against the insurers who have not contributed to the recovery." (internal quotation marks omitted)).  The Insurers do not contend Sycamore's alternate funding sources are substitute "insurers."  Moreover, the risk of double recovery is not present here.  After all, Sycamore has not received single recovery yet.  *See AT & T Corp. v. Clarendon Am. Ins. Co.*, 931 A.2d 409, 419 n.24 (Del. 2007) (distinguishing *Pan Pacific* on analogous facts for the same reason).

In *AT & T Corp. v. Clarendon American Insurance Company*,[139] the insured ("AHC"), having filed for bankruptcy, was unable to indemnify its directors for litigation liabilities after AHC's insurers denied the directors coverage. As a substitute, AHC's controlling stockholder ("AT&T") covered AHC's directors' settlement costs in exchange for the right to AHC's insurance proceeds. But when AT&T sought reimbursement from AHC's insurers, the insurers denied coverage, arguing, because AT&T covered the directors' settlement, the directors did not incur loss under the AHC policies.

To begin, the Supreme Court observed, under the AHC policies, the insurers were to provide pay-on-behalf-of coverage to the directors as soon as they became "legally obligated to pay" the settlement loss.[140] In other words, the Supreme Court found, regardless of who ultimately paid the settlement, the directors were liable for it. Within that framework, the Supreme Court further reasoned, had AT&T (or anyone else) not paid the settlement, the insurers would be unable to argue the directors had not incurred loss.

> Had AT&T never undertaken to indemnify the [directors], or had AT&T breached that undertaking, the . . . insurers would never have been in a position to argue that the [directors] incurred no "Loss" that triggers D & O coverage. The . . . insurers are able make this argument only because AT&T made and honored its commitment—a fact that elevates irony to new heights. The question is whether . . . AT&T's commitment—without which the [directors]

---

[139] 931 A.2d 409 (Del. 2007).
[140] *Id.* at 414.

would have been entitled to coverage of their defense and settlement costs under the D & O policies—divested those [directors] of that entitlement.[141]

With that understanding, the Supreme Court found "no case" supporting the insurers' position that the policy required the directors personally to pay for the settlement for AT&T to obtain coverage for their loss.[142]

Having concluded personal payment is not a prerequisite to coverage for a liability that attaches as soon as an insured faces a legal obligation to pay, the Supreme Court observed the insurers' argument reduced to a critique of the settlement's structure. The insurers argued, because the settlement was not premised on a "consent judgment," loss was eliminated when AT&T paid the settlement.[143] The Supreme Court understood this argument to mean the insurers would not have denied coverage if the directors had continuing liability for a "judgment debt."[144]

> We begin with the proposition, which the insurers themselves concede, that the . . . settlement payment would be a covered "Loss" if the . . . settlement . . . had been structured so that a consent judgment was first entered against the [directors], and then paid by AT&T. In terms of economic substance, a settlement so structured would be identical to the different settlement form actually employed [here]. That being the case, the . . . insurers' position necessarily reduces to the proposition that coverage under their policies turns entirely upon the matter of settlement structure.[145]

---

[141] *Id.* at 418.

[142] *Id.* The Supreme Court based its conclusion on California law, but there is no suggestion that the result would have been different under Delaware law. The Supreme Court relied on the policies' plain terms in finding the insurers arguments unsupported. *See, e.g.*, *id.* at 413–14.

[143] *Id.* at 420.

[144] *Id.* at 418.

[145] *Id.* at 420.

Rejecting that position, the Supreme Court ruled the policy's loss definition did not depend on "transactional form."[146]  Such a requirement, the Supreme Court added, would be "hypertechnical[]" and would obscure the fact that loss attaches whenever the insured has "in economic substance" an obligation to pay.[147]

The Insurers try to distinguish *AT & T* on facts inessential to its rulings.  But *AT & T* considered the same policy language and rejected the same arguments the Insurers rely on here to support their No Loss defense.  The Policies, like the *AT & T* policies, provide coverage for Loss as soon as an Insured becomes legally obligated to pay for it.  Indeed, the Insurers concede the Nine West Settlement would constitute a Loss had it been left unsatisfied.  They must.  As explained, the Policies define Loss to include settlements and exclude absolved Loss, not Loss that partially is paid by the third parties.  To the extent the Insurers suggest they would not have raised this defense had the Nine West Claims been resolved by judgment,[148] they unsuccessfully elevate "transactional form" over "economic substance."[149]  Indeed,

---

[146] *Id.* at 421.
[147] *Id.* at 421–22.
[148] *See* D.I. 298, Hr'g Tr. at 88–89 ("The Court: 'So if nobody paid this settlement, would you be contending Sycamore had not incurred the total amount of Loss? . . . Meaning, instead of the settlement, [suppose] it was a judgment that just remained unsatisfied[?]'" "[Counsel for the Insurers:] 'If a judgment were entered against someone, I would not be contending that their legal liability was extinguished.'").
[149] *AT & T*, 931 A.2d at 421.

the Policies define Loss to include settlements *and* judgments.[150]  Coverage, therefore, does not "turn[] . . . upon the matter of settlement structure."[151]

As in *AT & T*, the Insurers only were able to raise their No Loss defense because third parties paid a portion of the Nine West Settlement, despite having no apparent legal obligation to do so.  An insurer cannot deny coverage, thereby forcing the insured to find alternate sources of capital, and then argue the third-party payment relieves it of its contractual obligation to cover the loss it agreed to pay on behalf of the insured in the first place.  Such an "iron[ic]"[152] practice would undermine the purpose of pay-on-behalf-of insurance and would be inconsistent with Delaware law.  The Insurers' motion as to their No Loss defense therefore is denied.[153]

## D. The Insurers are not entitled to summary judgment on their Warranty Letter defense.

The Insurers' final defense concerns the Warranty Letter.  The parties agree the Warranty Letter functions as a contract.  Nevertheless, the Insurers ask the Court

---

[150] Policies at General Terms and Conditions § I.(O).

[151] *AT & T*, 931 A.2d at 420.

[152] *Id.* at 418.

[153] The Court declines Sycamore's request to grant it summary judgment *sua sponte* on this defense.  Granting summary judgment *sua sponte* typically is reserved for cases in which a claim or defense is so invalid as a matter of law and fact that it would be unjust to permit its survival simply because the non-movant formally did not request judgment against it.  *See Stroud v. Grace*, 606 A.2d 75, 81 (Del. 1992); *Bank of Del. v. Claymont Fire Co. No. 1*, 528 A.2d 1196, 1199 (Del. 1987).  For now, it is sufficient that this decision's interpretation of the Loss definition establishes law of the case that precludes the Insurers from reasserting this or a repackaged theory of their No Loss defense.

to depart from well-established principles of contract interpretation and hold the Warranty Letter's individual paragraphs must be construed in isolation. The Insurers' reading would produce an unreasonable and absurd result divorced from the Warranty Letter's text and purpose. For that reason, and those discussed below, the Court rejects the Insurers' reading and denies the Insurers' motion as resting on factual issues inappropriate for resolution at this stage.

**1. Read as a whole, the Warranty Letter requires the Insurers to prove Sycamore knew, at the time of contracting, of an act, error, or omission that could have been "reasonably expected" to give rise to a Claim.**

Before issuing the Policies, the Insurers required Sycamore, through the Warranty Letter, to make representations regarding its knowledge of potential Claims. In the Warranty Letter's first paragraph, Sycamore represented:

> [N]o person for whom this insurance is intended has any actual knowledge or information of any act, error, [or] omission that is reasonabl[y] expected to give rise to a claim within the scope of the [Policies].[154]

The Insurers declared they were relying on the "above representation" in making their decision to sell Sycamore the Policies.[155] By consequence, the Warranty Letter imposes a penalty should Sycamore's representation later be found untrue. Through the Warranty Letter's second paragraph, the parties agreed

> any claim based upon, arising from, or to any act, error, [or] omission of which any such person has any actual knowledge or information will be excluded from the [Policies].[156]

---

[154] Warranty Letter ¶ 1.
[155] *Id.* ¶ 3.
[156] *Id.* ¶ 2.

As contractual representations, these paragraphs must be read together according to their ordinary meaning. As contractual representations that form the basis of a coverage exclusion, these paragraphs also must be construed strictly and narrowly. To operate as an exclusion, the Insurers' interpretation must be the Warranty Letter's only reasonable construction.[157] It is not.

The opposite is true; the Warranty Letter unambiguously defeats the Insurers' interpretation. In the first paragraph, the terms "any" "act," "error," and "omission" are modified by the qualifier "reasonabl[y] expected." Plainly, then, Sycamore represented only that, at the time of contracting, it did not have "actual knowledge or information" of any act, error, or omission that reasonably could be expected to create a Claim. It did not represent that it lacked actual knowledge or information of "any" wrongdoing that *could* create a Claim, *i.e.*, knowledge of wrongdoing that was not reasonably expected to create a Claim.

The second paragraph does not vary the first paragraph's terms. The second paragraph's use of "any such person," together with its role as a mechanism for challenging false representations,[158] indicates the parties' intent to incorporate the first paragraph by reference.[159] Given that context, the identical terms "any act,

---

[157] *E.g.*, *Smith*, 201 A.3d at 571.

[158] Warranty Letter ¶ 2.

[159] *See Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 818–19 (Del. 2018) ("[D]ocuments or agreements can be incorporated by reference where a contract is executed which . . . makes the conditions of such other instrument a part of it. When that occurs, the two will be interpreted together as the agreement of the parties." (cleaned up)).

error, and omission" must be accorded the meaning they have in the first paragraph.[160] Incorporating the first paragraph, the second paragraph only excludes coverage for the acts, errors, or omissions of which Sycamore had "any actual knowledge or information" *and* that could be "reasonabl[y] expected" to generate a Claim. Accordingly, to exclude coverage, the Insurers must prove Sycamore had actual knowledge or information about an act, error, or omission that, at the time of contracting, reasonably could be expected to create a Claim under the Policies.

To lay the cornerstone for a lighter burden of proof at trial, the Insurers insist these two paragraphs "mean different things."[161] That framing enables the Insurers to argue the absence of reasonable expectation language in the second paragraph makes the second paragraph, in effect, a "Prior Knowledge Exclusion" that bars coverage for "any" prior claim-producing wrongdoing, however remote, Sycamore knew about, notwithstanding the more limited representation Sycamore made earlier.[162]

The Insurers' reading, however, is unreasonable. As an initial matter, the Insurers' construction would require the Court to treat each paragraph in the Warranty Letter as a separate contract. But the Insurers fail to identify any Delaware

---

[160] *See id.* at 819 ("[W]hen incorporated matter is referred to for a specific purpose only, it becomes a part of the contract for that purpose only, and should be treated as irrelevant for all other purposes. (internal quotation marks omitted)).

[161] D.I. 240 at 40.

[162] *Id.* at 40–46.

authority for the proposition that provisions in the same agreement must be construed in isolation. They could not. Under Delaware law, insurance contracts, like all contracts, must be read as a whole, giving purpose to each provision.[163] Even so, it would be absurd to find terms defined by one provision and repeated verbatim in another to have different meanings depending on where the eye lands. More than absurd, such a finding would violate black letter contract law.[164] Under Delaware law, "where parties attach a particular meaning to a term, that meaning should be given effect."[165] Additionally, the meaning accorded one portion of an agreement cannot control the meaning of the entire agreement in a way that contradicts the agreement's overall scheme and plan.[166]

---

[163] *E.g.*, *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 287 (Del. 2001) ("[A] court's interpretation of an insurance contract must rely on a reading of all of the pertinent provisions of the policy as a whole, and not on any single passage in isolation."); *see In re Viking Pump*, 148 A.3d 633, 648 (Del. 2016) ("[C]ourts interpreting a contract will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." (internal quotation marks omitted)).

[164] *E.g.*, *Honeywell Int'l, Inc. v. Air Prods. & Chems., Inc.*, 872 A.2d 944, 956 (Del. 2005) ("[T]he record contains no persuasive evidence that the parties intended that identical terms in their contract would be given disparate meanings. Generally, and absent evidence calling for a different result, all parts of a contract must be read in harmony to determine the contract's meaning, with one portion of a contract not being read to negate a different portion.").

[165] *Id.* (citing Restatement (Second) of Contracts § 202(3)(b)); *see DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005) ("Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.").

[166] *See E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985); *see also Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998) ("[A] court interpreting any contractual provision . . . must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument.").

In addition to violating those basic tenets of Delaware law, the Insurers' reading of the second paragraph would render the first paragraph superfluous.[167] The Insurers do not explain why the first paragraph—which contains Sycamore's only representation—exists if it has no relationship to the second paragraph—which provides a penalty should that representation be found false. Yet, there would be no commercial purpose for requiring the Warranty Letter, or Sycamore's representation, if the Insurers were free, contrary to their own representations,[168] not to rely on it in deciding whether to issue the Policies.[169]

The Insurers' reading also is inconsistent with the Policies, which, in comprising the same transaction, must be construed together with the Warranty Letter.[170] The Policies provide an exhaustive list of exclusions. But the Insurers' interpretation of the Warranty Letter would operate as a new Prior Knowledge Exclusion that is not referenced in the Policies' language. That addition would frustrate Sycamore's reasonable coverage expectations by permitting the Insurers to

---

[167] *But see, e.g.*, *Sonitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del. 1992) ("Under general principles of contract law, a contract should be interpreted in such a way as to not render any of its provisions illusory or meaningless.").

[168] Warranty Letter ¶ 3 ("It is also agreed that such carriers noted above are relying upon the above representation. . . .").

[169] *But see Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 926–27 (Del. 2017) (observing that a court's contract interpretation must be reasonable when the contract is "read in full and situated in the commercial context between the parties," as "[t]he basic business relationship between [the] parties must be understood to give sensible life to any contract").

[170] *E.g.*, Restatement (Second) of Contracts § 202(2); *accord Trexler v. Billingsley*, 2017 WL 2665059, at *4 n.21 (Del. June 21, 2017).

exclude coverage on a less stringent standard of proof—*i.e.*, "any" Claim-producing wrongdoing as opposed to wrongdoing that could be "reasonabl[y] expected" to produce a Claim—than the parties agreed on. By eliminating the reasonably expected qualifier, the Insurers, contrary to the Policies' terms and the Warranty Letter's plain language, effectively would grant themselves the right to exclude coverage based on nearly anything that occurred before the Policies were executed. The Court cannot revise contract terms the Insurers willingly accepted.[171]

In any event, exclusions must be construed strictly and narrowly.[172] At minimum, Sycamore's reading is narrower and more reasonable, as it gives meaning to the entire Warranty Letter.[173] The Insurers' failure to advance any reasonable, let

---

[171] *E.g.*, *W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2007 WL 3317551, at *9 (Del. Ch. Nov. 2, 2007) ("The presumption that the parties are bound by the language of the agreement they negotiated applies with even greater force when the parties are sophisticated entities that have engaged in arms-length negotiations."), *aff'd*, 2009 WL 4154356 (Del. Nov. 24, 2009); *NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007) ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court."), *aff'd*, 2008 WL 571543 (Del. Mar. 4, 2008); *DeLucca v. KKAT Mgmt., L.L.C.*, 2006 WL 224058, at *2 (Del. Ch. Jan. 23, 2006) ("[I]t is not the job of a court to relieve sophisticated parties of the burdens of contracts they wish they had drafted differently but in fact did not."); *see also Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006) ("A court must accept and apply the plain meaning of an unambiguous term . . . in the contract language . . ., insofar as the parties would have agreed *ex ante*.").

[172] *See Murdock*, 248 A.3d at 906.

[173] *See id.* at 905 ("Proper interpretation of an insurance contract will not render any provision illusory or meaningless." (internal quotation marks omitted)).

alone the only reasonable, reading of the Warranty Letter, prevents them from obtaining judgment as a matter of law.[174]

**2. Whether Sycamore knew of wrongdoing that reasonably could be expected to give rise to a Claim is a factual issue.**

In their brief, the Insurers concede that whether Sycamore had actual knowledge or information about an act or omission that reasonably could be expected to give rise to a Claim is a jury issue.[175] The Insurers, therefore, concede their motions are not supported by undisputed material facts. Accordingly, their motions must be denied.[176]

## CONCLUSION

For the foregoing reasons, Sycamore's motion for partial summary judgment is **GRANTED** and the Insurers' motions for summary judgment are **DENIED**.

**IT IS SO ORDERED**.

---

[174] *E.g.*, *Smith*, 201 A.3d at 571 ("The burden is on the insurer to establish that policy exclusions or exemptions apply in a particular case, and that they are subject to no other reasonable interpretation." (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Rhone–Poulenc Basic Chems. Co.*, 1992 WL 22690, at *8 (Del. Super. Ct. Jan. 16, 1992), *aff'd sub nom.*, *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1198 (Del. 1992))).

[175] D.I. 240 at 39.

[176] Because the record permits the Insurers to argue at trial that Sycamore had actual knowledge of an act or omission that reasonably could be expected to give rise to a Claim, the Court declines to grant Sycamore summary judgment *sua sponte* as to this defense. *See supra* note 153.